# UNITED STATES DISTRICT COURT

## for the

Eastern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| **Phone 1 - Black Samsung cellular telephone bearing serial number 268435459510885137, seized pursuant to a federal warrant from Lindsey Mills on July 15, 2013, and currently in the custody of DEA; and** | ) ) ) ) ) | Case No. |
| **Phone 2 - Samsung MetroPCS cellular telephone bearing serial number 268435459505903452, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA; and** | ) ) ) ) ) ) | 2:19 - SW  789 ___ AC |
| **Phone 3 - LG MetroPCS cellular telephone bearing serial number 268435460007533541, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA; and** | ) ) ) ) ) ) | **FILED** SEP 11 2019 |
| **A Digital Video Recording Device ("DVR") - One DVR located in the master bedroom office of James Sherman within his residence at 2695 Ramsey Road, Stockton, California, during service of a federal search warrant on July 15, 2013, and currently in the custody of DEA.** | ) ) ) ) ) ) | CLERK, U.S. DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA BY _____ DEPUTY CLERK |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENTS B and C, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841 (a)(1) | Distribution and possession with intent to distribute heroin and cocaine. |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested

under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
DEA, SA Brian Nehring
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____9/10/19_____

_____
*Judge's signature*

City and state:     Sacramento, California _____

_____
Allison Claire, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent Brian Nehring of the DEA, being duly sworn, depose and state as follows:

## Background and Expertise

1. I am a Special Agent of the Drug Enforcement Administration (DEA), San Francisco Field Division, and have been so employed since 1991. I have had numerous assignments since beginning with DEA, including being assigned to the Clandestine Laboratory Enforcement Team from 1997 to 1999, the Oakland Resident Office between 1999 and 2002, and the Mobile Enforcement Team (MET) between 2002 and 2004. I have been assigned to the Sacramento Division Office since September of 2004.

2. I have received specialized training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal, from the Drug Enforcement Administration (DEA). In addition, I graduated from the DEA Basic Agents Academy at the FBI Academy at Quantico, Virginia. In total, I have received in excess of 500 hours of comprehensive formalized classroom instruction in those areas outlined above.

3. I have assisted in the execution of more than 400 warrants to search particular places or premises for controlled substances and/or related paraphernalia, indicia and other evidence of violations of federal drug narcotics statutes. As a result, I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the traffickers' effort to make a profit from those dealings or transactions, either for the purchase of additional substances or material gain. I have been actively involved as case agent in excess of 200 investigations and have talked with confidential informants involved in the trafficking of narcotics, and this has formed the basis of my opinions.

4. I have been qualified as and have testified as an expert witness in both federal and state court in the Northern and Eastern Districts of California and in counties including Alameda, Contra Costa, Solano, Sacramento and others. These areas of qualification have included possession for sale, possession with intent to distribute, manufacturing of a controlled substance and cultivation.

**Scope of Requested Search Warrant**

5.  This Affidavit is submitted in support of a search warrant to search three cellphones and one DVR player that were previously seized pursuant to federal search warrants on July 15, 2013. Since the time that DEA seized the phones, they have been maintained in a secure DEA evidence facility and have not been modified, altered, or otherwise manipulated.

The phones targeted by this warrant are:

Phone 1    -    Black Samsung cellular telephone bearing serial number 268435459510885137, seized pursuant to a federal warrant from Lindsey Mills on July 15, 2013, and currently in the custody of DEA; and

Phone 2    -    Samsung MetroPCS cellular telephone bearing serial number 268435459505903452, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA.

Phone 3    -    LG MetroPCS cellular telephone bearing serial number 268435460007533541, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA.

Digital Video Recording Device ("DVR")  -  One DVR located in the master bedroom office of James Sherman within his residence at 2695 Ramsey Road, Stockton, California, during service of a federal search warrant on July 15, 2013, and currently in the custody of DEA.

**Summary of Investigation**

6.  Between 2011 and 2013, DEA conducted an extensive investigation into the heroin and crack cocaine trafficking by the Stockton-based target James Randolph Sherman. As part of that investigation, DEA used two separate confidential sources to buy heroin and crack cocaine from two of Sherman's downstream distributors, James Timberlake and Lindsey Mills. Ultimately, a grand jury indicted Sherman and Mills in *United States v. Sherman, et al.*, Case No. 2:13-cr-0302 MCE, for conspiracy to distribute heroin and crack cocaine, distributions of heroin and crack cocaine, and marijuana-related charges based upon evidence seized from Sherman's residence.

7.  On December 3, 2015, Mills entered a guilty plea to a charge conspiracy to distribute and possess with intent to distribute heroin and crack cocaine. *See United States v.*

2

*Sherman, et al.*, Case No. 2:13-cr-0302 MCE, Docket No. 79.  In his written plea agreement, Mills admitted that between March 14, 2012, and June 27, 2013, he distributed crack cocaine and heroin to CS-2 on March 14, 2012, April 26, 2012, June 26, 2012, and June 27, 2013, as part of an ongoing conspiracy with his charged co-conspirator James Sherman.  Docket No. 49, Ex. A, at 1.  Mills specifically admitted that during each of the deals listed between 2012 and 2013, Sherman supplied the crack cocaine and heroin to Mills.

8.  A thorough summary of the investigation is contained the Affidavit contained in **Attachment C**, attached and incorporated here by reference.

9.  In sum, while using a confidential source ("CS-2") to purchase heroin and crack cocaine from Lindsey Mills, between March 2012 and July 2013, Mills was in contact with, or seen meeting with, James Sherman before or after the time scheduled for the drug deals.  In addition, when Mills made recorded calls to CS-2 or was recorded making comments in person to CS-2, Mills identified a person I believe was James Sherman based upon his comments he made.  For instance, on more than one occasion during the investigation, Mills told CS-2 that he was meeting with his supplier at time when surveillance before or after a controlled buy observed Mills meeting with Sherman.  The specifics of CS-2's background are detailed in Attachment C.  In addition, after this investigation, on or about April 4, 2018, CS-2 was convicted of engaging in unauthorized criminal conduct, specifically, attempted murder, robbery, felon in possession of a firearm and related charges.  CS-2 was sentenced to 32 years to life for his/her crimes.

10.  Based upon the results of the investigation, DEA seized three phones from Lindsey Mills during the takedown on July 15, 2013.  In particular, the phones were discovered in the following places during the takedown.  I believe there is a fair probability that each of these phones may contain evidence of the drug trafficking conspiracy between Mills and Sherman in the form of text messages, photographs, contact lists, and call logs.  Below, I have highlighted on some additional specific information from the investigation that leads me to believe the three phones in DEA custody that were seized from Mills and Mills's residence during the conspiracy may contain evidence of his agreement to distribute heroin and crack cocaine with James Sherman.

11.  On July 15, 2013, agents recorded CS-2 engaged in drug-related calls with Mills.  During the calls, Mills said his source of supply had been in his mother's neighborhood waiting to deliver the cocaine base to MILLS and had observed numerous undercover drug agents in the area and was unwilling to deliver the drugs to Mills.  An examination of the GPS locator information for SHERMAN's telephone showed that SHERMAN's identified telephone was over the span of several hours in the immediate area in-and-around the immediate neighborhood where MILLS's mother's residence was located.  Agents conducting surveillance of Mills subsequently had him stopped and arrested on the outstanding federal arrest warrant.  At the time his arrest, agents found approximately ½ ounce of crack cocaine in tin foil

in the trunk of Mills's car, and another approximate ½ once of crack cocaine in an Altoids can on Mills's person.

12. Agents also discovered **Phone 1** on Mills's person at the time at the time of his arrest. **Phone 1** is a black Samsung cellular telephone bearing serial number 268435459510885137. Once this phone was seized, it has remained in the secure custody of DEA and designated DEA Ex. N-32. I believe Phone 1 may contain evidence of Mills's then-ongoing communications about heroin and crack cocaine trafficking based upon the events of that day and the course of conduct throughout the investigation, including phone records linking Mills and Sherman as well as physical surveillance.

13. On July 15, agents also discovered **Phone 2** and **Phone 3** during a search of Mills's residence, 1764 Shady Forest, Stockton, California. Mills's residence also contained tools of the drug trafficking trade. In particular, in the master bedroom, agents found an orange Nike shoebox. Inside the box, agents discovered scales, packaging materials, rubber gloves, and cutting blades: all items consistent with Mills weighing and packaging drugs for sale. On the shelf in the master bedroom closet, agent also discovered a Rohm .22 caliber revolver. Agents found **Phone 2** and **Phone 3** in the kitchen of the residence. In the same kitchen, agents found and seized indicia of Mills's occupancy of the residence. **Phone 2** is a Samsung MetroPCS cellular telephone bearing serial number 268435459505903452. **Phone 3** is LG MetroPCS cellular telephone bearing serial number 268435460007533541. Once these phones were seized, they have remained in the secure custody of DEA and designated DEA Ex. N-29. I believe Phone 2 and Phone 3 may contain evidence of Mills's then-ongoing communications about heroin and crack cocaine trafficking based upon the events of that day and the course of conduct throughout the investigation, including phone records linking Mills and Sherman as well as physical surveillance. Although Mills lived at 1764 Shady Forest with his wife, I am not aware of any meaningful way to distinguish ownership between Phone 2 and Phone 3.

14. As previously mentioned, Mills ultimately entered a guilty plea to his conspiracy with Sherman and was sentenced by the Honorable Morrison C. England to 57 months in prison on May 19, 2016. *United States v. Sherman, et al.*, Case No. 2:13-cr-0302 MCE, Docket No. 97.

15. During the investigation, CS-1 told us that Mills's cellular telephone number was (209) 570-7459. I examined a pen register then active on the identified cellular telephone of James Sherman, (209) 993-9753, as a result of the investigation of a James Timberlake (who was also believed to be supplied by Sherman at that time). After examining the pen register information for Sherman number, I learned that Sherman's cellular telephone was in high-frequency contact at that time with (209) 570-7459 (identified by CS-1 as the cellular telephone number belonging to Lindsey Mills). Metro PCS records subsequently confirmed this phone number was subscribed in the name of Lindsey Mills.

4

16. The drug dealer connected to Sherman during the 2011/early 2012 investigation, James Timberlake, was approached by DEA agents in 2015. On October 27, 2015, Timberlake gave a statement after being advised of his rights under *Miranda*. During the interview, Timberlake said he had known James Sherman for many years. He said that he, Mills, and Sherman all grew up together in south Stockton. According to Timberlake, the heroin that he sold to CS-1 during 2011 and 2012 were supplied by Sherman on credit. After Timberlake sold the heroin to CS-1, Timberlake gave the money owed back to Sherman. Timberlake admitted that he got ounces of both heroin and cocaine from Sherman during 2011 and 2012 that Timberlake in turn distributed to others.

17. On July 15, 2013, agents served a federal warrant at Sherman's residence, located at 2695 Ramsey Road, Stockton, California. During the warrant, agents recovered a number of items consistent with Sherman's involvement in drug trafficking. Sherman was not present at the time of the warrant on July 15.

18. Specifically, during the search, agents found a fenced-in outdoor marijuana grow behind the residence with 77 marijuana plants. They also found approximately 15 pounds of processed marijuana in tubs in Sherman's garage. Also inside the garage was a 2001 Volvo station wagon. Agents searched the Volvo and found a digital scale and a large plastic bucket with approximately one pound of marijuana packaged in 16 individual ounce bags.



19. On a table in the garage, agents also found multiple boxes of plastic bags and another digital scale. Underneath a box in the garage, agents found two vials containing a white substance used for adulterating or cutting crack cocaine. Inside a refrigerator in the main residence, agents found the below 187.7 gross grams of a brown substance used for adulterating or cutting heroin. Agents located Sherman's mother and his four juvenile children in an adjacent, separate house but Sherman was nowhere to be found.

20. Within the master bedroom office of Sherman's residence, agents discovered a **Digital Video Recording Device ("DVR")**. At the time of the search, agents noted

that the DVR was recording activity from video surveillance in the house. I believe the DVR may show Sherman within his house engaged in drug trafficking activity that was captured by his video surveillance system. The DVR was seized and has resided in secure DEA custody since July 15, 2013. The item was designated as DEA Ex. N-42.

21. On August 20, 2013, more than a month after the search, Sherman made his initial in federal court after turning himself into the U.S. Marshals. *United States v. Sherman, et al.*, Case No. 2:13-cr-0302 MCE, Docket No. 16.

22. This Affidavit therefore requests authority to search the three phones and DVR player described in Attachment A in order to locate and seize the items described in Attachment B as evidence and instrumentalities of the violations described in the Attachment.

## **Training and Experience Regarding Drug Trafficking and Drug Traffickers**

23. In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videos on their phones.

24. Individuals involved in the distribution of methamphetamine often make, or cause to be made, pictures, videos, movies, or other such items on their phones which contain photographic or digital images in order to memorialize their methamphetamine distribution, use, possession, or any other activities surrounding their methamphetamine trafficking activities, and that such items often identify co-conspirators in their drug trafficking activities.

25. It has been my experience in the past, and particularly in this case, that when suspects use mobile telephones to communicate with co-conspirators, cooperating individuals or undercover agents to set up drug deals, records relating to these activities will be found stored in the cellular telephone. And, as relevant to this case, the drug traffickers in this case (James Timberlake, Lindsey Mills, and James Sherman), made extensive use of phone communication to discuss their ongoing drug trafficking during the conspiracy. I believe the three phones identified from the arrest of Mills and search of his residence may contain additional evidence specific to the drug trafficking agreement between Mills and Sherman between March 2012 and July 2013 when I believe that Mills was using these phones to facilitate his drug dealing and communicate with Sherman about that drug trafficking.

26. I know that drug dealers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store

telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

27.   As described above and in **Attachment A**, this Affidavit seeks permission to search and seize things that are related to the drug trafficking conspiracy between James Sherman and Lindsey Mills, in whatever form such things are stored on the three phones identified here. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28.   It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in **Attachment B** are items most often associated with the distribution of controlled substances, including methamphetamine as well as the proceeds from such illegal operations.

29.   The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

30.   Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain in their phones the items described in

7

**Attachment B**.  Therefore, I am requesting authority to seize all the items listed in **Attachment B** to this Affidavit and incorporated here by reference.

## <u>Conclusion</u>

32.     Based on this Affidavit, I respectfully request authority to search:

Phone 1   -     Black Samsung cellular telephone bearing serial number 268435459510885137, seized pursuant to a federal warrant from Lindsey Mills on July 15, 2013, and currently in the custody of DEA; and

Phone 2   -     Samsung MetroPCS cellular telephone bearing serial number 268435459505903452, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA.

Phone 3   -     LG MetroPCS cellular telephone bearing serial number 268435460007533541, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA.

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

Brian Nehring, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before
me on the ___10___ day of September 2019

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

Jason Hitt
Assistant U.S. Attorney

**Attachment A**
**Locations to be Searched**

Phone 1   -   Black Samsung cellular telephone bearing serial number
268435459510885137, seized pursuant to a federal warrant from Lindsey
Mills on July 15, 2013, and currently in the custody of DEA; and

Phone 2   -   Samsung MetroPCS cellular telephone bearing serial number
268435459505903452, seized pursuant to a federal warrant from the
residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on
July 15, 2013, and currently in the custody of DEA.

Phone 3   -   LG MetroPCS cellular telephone bearing serial number
268435460007533541, seized pursuant to a federal warrant from the
residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on
July 15, 2013, and currently in the custody of DEA.

Digital Video Recording Device ("DVR")   -   One DVR located in the master
bedroom office of James Sherman
within his residence at 2695 Ramsey
Road, Stockton, California, during
service of a federal search warrant
on July 15, 2013, and currently in
the custody of DEA.

**Attachment B**
**Items to be Seized**

Agents are authorized to search and seize property that phones identified in Attachment A for violations of the following federal statutes (the "Target Offenses"), committed by Lindsey Mills and James Sherman and their co-conspirators:

- Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute Heroin and a form of Cocaine Base known as "Crack" Cocaine.

- Title 21 U.S.C. Section 841(a)(1) – Distribution and Possession with Intent to Distribute Heroin or Crack Cocaine.

- Title 21 U.S.C. Section 843 – Use of a Communication Facility to Facilitate a Drug Trafficking Crime, specifically, Distribution of Heroin and Crack Cocaine.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Address books and other such address listings, letters, cables, telegrams, photographs, audio, and videos connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

2. All names, words, telephone numbers, email addresses, time/date information, text messages, or any other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones described in Attachment A. This authority to search the phones identified in Attachment A includes the following within each phone:

   A. Incoming call history;
   B. Outgoing call history;
   C. Missed call history;
   D. Outgoing text messages;
   E. Incoming text messages;
   F. Draft text messages;
   G. Telephone book;
   H. Data screen or file identifying the telephone number associated with the mobile telephone searched;
   I. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;
   J. Voicemail;
   K. User-entered messages (such as to-do lists);
   L. Photographs; and
   M. Any passwords used to access the electronic data described above; and

3. Video recordings and data from the DVR described in Attachment A that shows James Sherman engaged in drug trafficking activity, or associated with individuals engaged in

drug trafficking in the following locations: outside the house and inside the garage, office, kitchen, and home gym.

///

///

///

///

///

///

///

**Attachment C**

AO 91 (Rev. 12/03) Criminal Complaint 8/07

Case 2:13-cr-00302-MCE   Document 1   Filed 07/12/13   Page 1 of 20

**SEALED**

# UNITED STATES DISTRICT COURT

**FILED**

**EASTERN**  DISTRICT OF  **CALIFORNIA**

JUL 1 0 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA

v.

James Randolph SHERMAN
Lindsey MILLS

**CRIMINAL COMPLAINT**

CASE NUMBER:

**2 13 - MJ - 0 2 0 8   KJN**

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about **see below** in **San Joaquin** County, in the Eastern District of California defendant(s) did,
(Track Statutory Language of Offense)

COUNT ONE: Between approximately March 14, 2012 and the present, knowingly and intentionally engage in a conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

COUNT TWO: Between approximately June 26, 2012 and the present, engage in a conspiracy to distribute and possess with intent to distribute at least 280 grams mixture and substance containing a detectable amount of cocaine base, a Schedule I Controlled Substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

I further state that I am a(n) DEA Task Force Officer and that this complaint is based on the following facts:

▸ **SEE ATTACHMENT**

Continued on the attached sheet and made a part of this complaint:    X _____

Gary Malmquist, DEA Task Force Officer

Sworn to before me, and signed in my presence
July 10, 2013                                                         at    Sacramento, California

Date                                                                          City                    State

U.S. Magistrate Judge Kendall J. Newman

Name of Judge                    Title of Judge                         Signature of Judge

### Affidavit of DEA Task Force Officer Gary Malmquist In Support of a Search Warrant and Criminal Complaint

I, Gary Malmquist, being duly sworn state the following:

### Background and Expertise

1. I am a Task Force Agent of the Drug Enforcement Administration and have been so assigned since November of 2010. I am employed by the Sacramento Police Department in the Office of Investigations as a Narcotics Detective since January 2004. I have been a sworn Peace Officer in California since 1997. I am currently assigned to the San Francisco Field Division, Sacramento District Office of the DEA, specifically assigned to investigate federal narcotics offenses.

2. I have received specialized training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal, from the California Department of Justice (DOJ) and California Department of Corrections and Rehabilitation (CDCR). In addition, I graduated from the California DOJ Narcotics Investigators Course. In total, I have received in excess of 100 hours of comprehensive formalized classroom instruction in those areas outlined above.

3. I have assisted in the execution of more than one hundred (100) warrants to search particular places or premises for controlled substances and/or related paraphernalia, indicia and other evidence of violations of federal drug narcotics statutes. As a result, I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the traffickers' effort to make a profit from those dealings or transactions, either for the purchase of additional substances or material gain.

4. I have been qualified as and have testified as an expert witness in both federal and state court in the Northern District of California and in Sacramento County. These areas of qualification have included possession for sale, possession with intent to distribute and manufacturing of a controlled substance.

## Scope of Requested Criminal Complaint and Search Warrant

5.  This Affidavit is submitted in support of a Criminal Complaint charging **Lindsey Earl MILLS** and **James Randolph SHERMAN** with:

    COUNT ONE: BOTH DEFENDANTS: Between approximately March 14, 2012 and the present, conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of 21 U.S.C. §§846 and 841(a)(1).

    COUNT TWO: BOTH DEFENDANTS: Between approximately June 26, 2012 and the present, conspiracy to distribute and possess with intent to distribute at least 280 grams mixture and substance containing a detectable amount of cocaine base, a Schedule I Controlled Substance, in violation of 21 U.S.C §§846 and 841(a)(1).

6.  This Affidavit is also submitted in support of a search warrant to search the following locations

    A.  The current residence of MILLS located at **1764 Shady Forest Way, Stockton, California;**

    B.  **San Joaquin County parcel APN#089-100-48** in San Joaquin County, California, which corresponds to a listed address of **2695 Ramsey Avenue, Stockton, California** according to San Joaquin County Property Records. It is a 12.5 acre rural parcel located at the north west termination of Ramsey Avenue;

    C.  The person of Lindsey Earl MILLS;

    D.  The person of James Randolph SHERMAN; and

    E.  All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.

## Background of the Investigation

### 2011 Information from CS1 Regarding Lindsey MILLS and James Sherman's Current Drug Trafficking Activities and Identification of Residences

15. In late November of 2011, Special Agent Brian Nehring was contacted by a confidential source ("CS1") who provided information regarding the ongoing drug trafficking activities of Lindsey MILLS.

16. Beginning in 2011 and continuing through the present, CS1 agreed to cooperate with DEA after being indicted on a federal drug charge. CS1 is providing information and cooperation with the hope of receiving a reduced sentence for the pending federal felony charges. The assigned Assistant United States Attorney has authorized CS1's effort to cooperate on his/her case. CS1 has been arrested and convicted of Auto Theft (1978), Possession of a Firearm (1978), Receiving Stolen Property (1980), Armed Robbery and Kidnapping (1981), Possession for Sale –Cocaine Base, Battery on a Police Officer (1991), Auto Theft (1995), Sexual Penetration w/Foreign Object on a Minor and Oral Copulation (1996), Possession/Manufacture Dangerous Weapon (2002) and one Federal charge of Attempt/Conspiracy to Distribute Drugs (2006).

17. During this investigation, CS1 has spoken with and met MILLS and other suspected customers of James SHERMAN at the direction of either I or Special Agent Brian Nehring. CS1 provided introductions for additional Confidential Sources, including CS2 described below, to MILLS and others. Information provided by CS1 has proven reliable and was independently corroborated through telephone records, physical surveillance, public records and information provided by other confidential sources and sources of information. I am not aware of CS1 providing be false or intentionally misleading information in this investigation. For these reasons, I consider CS1's information in this investigation to be reliable.

18. CS1 related that he/she had recently been contacted by an individual CS1 had known for several years named Lindsey MILLS. According to CS1, Lindsey MILLS was male Black adult, approximately 50 years of age, who was currently a large distributor of cocaine and cocaine base in the Stockton area. CS1 said MILLS had been distributing crack cocaine for many years. MILLS told CS1 that he (MILLS), had numerous distribution spots where he paid individuals to sell his cocaine. During the conversation with CS1, MILLS said he had been obtaining kilograms of cocaine from "the biggest OG in Stockton" and that he and this source of supply had grown up together and were the same age. MILLS went on to say this source owned a large ranch located in an orchard just off the highway, a few miles east of Stockton.

19. CS1 related that MILLS's source of supply was also allegedly the source of supply for other specific heroin and cocaine base dealers in the Stockton area. The dealers identified by CS1 were previously investigated by DEA during 2011. In that investigation, the dealers were suspected of being supplied by James SHERMAN based upon controlled purchases, surveillance, and phone toll analysis. During that investigation, agents observed SHERMAN meeting with a suspected sub-dealer before and after controlled purchases of drugs in Stockton. As a result, it was determined that SHERMAN resided at **San Joaquin County parcel APN#089-100-48** in San Joaquin County, California, corresponding to a listed address of **2695 Ramsey Avenue, Stockton, California** per San Joaquin County Property

Records, further described as a 12.5 acre rural parcel located at the north west termination of Ramsey Avenue. This is a large ranch-type property in an orchard on a dead-end road a few miles east of Stockton off of Highway 26. This property was consistent with CS1's description of the residence for MILL's source (a ranch located in an orchard) and is located in the same area (a few miles east of Stockton). As detailed below, during 2011 (and through 2012 and as recently as June 2013) agents observed SHERMAN and his vehicles at this ranch property. Property records analysis showed that SHERMAN had been the owner of this property but subsequently transferred title of this property and three others he owned into the name of DBPH ENTERPRIZES INC. in recent years, though he continued to reside at this location according to DMV inquiries and multiple database checks.

20. According to CS1, MILL's cellular telephone number was (209) 570-7459. Special Agent Nehring examined a pen register then active on the identified cellular telephone of James SHERMAN, (209) 993-9753, as a result of the investigation of a separate individual believed to be supplied by SHERMAN at that time. After examining the pen register information for SHERMAN's number, Special Agent Nehring learned that SHERMAN's cellular telephone was in current high-frequency contact with (209) 570-7459 (identified by CS1 as the cellular telephone number belonging to Lindsey MILLS). Metro PCS records subsequently confirmed this phone number was subscribed in MILLS's name. The contact between the MILLS number and the SHERMAN number was more frequent contact than the identified telephones for other sub-dealers.

21. CS1 further explained that he/she met with MILLS in October of 2011. When the two met, MILLS took CS1 to locations in Stockton that he (MILLS) used to distribute cocaine and cocaine base. MILLS went on to say that has been making several hundreds of thousands of dollars each month from these locations and that he was obtaining the kilos of cocaine from his source of supply.

22. Inquiries with the California Department of Justice revealed that SHERMAN has criminal history including a felony conviction on or about September 6, 1996, for Transportation of a Controlled Substance, for which he received a three-year prison to three years prison (suspended sentence) and five years probation.

23. MILLS also has criminal history that includes misdemeanor convictions for receiving stolen property, possession of a controlled substance, being under the influence of a controlled substance and domestic violence. Most of the convictions resulted in probation and/or diversion sentences.

24. Inquiries with the California DMV revealed that MILLS had consistently provided **1764 Shady Forest Road, Stockton, California** as his resident address through the present.

MILLS currently lists multiple vehicles registered to himself at this address. Agents observed MILLS and his vehicles at this location during 2012 and through June of 2013.

### 2012 Controlled Purchases of Heroin and Cocaine Base from Lindsey MILLS in which James SHERMAN is Identified as Source of Supply

25. During early 2012, CS1 related that he/she had been approached by MILLS on multiple occasions during which MILLS informed CS1 that he (MILLS) was aware of an associate of CS1's buying heroin from another sub-dealer supplied by SHERMAN in the Stockton area. According to CS1, MILLS was upset that CS1's associate was going to this person when CS1 knew that MILLS was much closer to SHERMAN. MILLS informed CS1 that, although he dealt primarily in kilogram quantities of cocaine with the source of supply, he could obtain any amount of heroin from the same source and the quality would be much higher. This would allow CS1's associate to "cut" the heroin and thus obtain a higher profit. MILLS referred to the supplier as, "the OG who lives on the ranch east of town." In my training and experience, the term "OG" typically refers to someone who has earned respect within a particular criminal community because of their long term involvement in criminal activity. The letters "OG" are an abbreviation for the term "original gangster." It should be noted that the reference to "gangster" in this term does not necessarily mean the individual is an actual gang member; rather, it means they have been involved in criminal activity for a significant period of time and have earned respect among other criminals. The person may, or may not, be a member of a gang. After hearing the information from MILLS, CS1 agreed to introduce his/her associate ("CS2") to MILLS in March of 2012, which subsequently occured.

26. Between March 2012 to June of 2013, CS2 made controlled purchases from MILLS at DEA's direction totaling 348.8 grams of heroin and more than 400 grams of cocaine base. All of these drug deals occurred in the parking lot of the Valero gas station located at 3300 N. West Lane in Stockton. As described below, surveillance units observed MILLS either meeting with SHERMAN at SHERMAN'S residence (2695 Ramsey Avenue, Stockton) just prior to conducting a transaction with CS2 or immediately following a narcotic transaction with the CS2 in which MILLS met with SHERMAN at MILLS' residence (1764 Shady Forest Road Stockton).

27. CS2's criminal record includes arrests and convictions for Hit and Run (1989), Robbery/Auto Theft (1992), Possession for Sales-Cocaine and Possession of a Firearm (1993) and Domestic Violence (2004). Information provided by CS2 has proven reliable and has been independently corroborated through telephone records, physical surveillance, public records, and information provided by other confidential sources and sources of information. I have not found the CS2's information to be false or intentionally misleading. In a past investigations, CS2 has made controlled purchases of controlled substances at

Special Agent Nehring's direction. CS2's information and assistance during those investigations was utilized in obtaining state and federal search warrants and arrest warrants. As a result of those search warrants, law enforcement seized controlled substances, including cocaine, cocaine base and methamphetamine and firearms, and individuals have been successfully prosecuted for narcotics offenses. For these reasons, I consider CS2's information in this investigation reliable.

### March 14, 2012 – CS2 Purchases Four Ounces of Heroin from Lindsey MILLS in Stockton

28.    On March 14, 2012, Special Agent Nehring and I met with CS1 and CS2 in anticipation of purchasing four ounces of heroin from MILLS in Stockton.

29.    At this time, CS1 indicated that he/she had spoken with MILLS on March 12 and March 13 over cell phone number (209) 570-7459 and informed MILLS that he/she would be in Stockton on March 14 and was interested in purchasing four ounces of heroin. During the conversation between CS1 and MILLS, MILLS confirmed that he had spoken with his source of supply and would be picking up the heroin later that night (March 13) or during the day on the March 14.

30.    In anticipation of meeting with MILLS, on March 14, 2012, between 6:00 p.m. and 7:00 p.m., CS1 and MILLS exchanged numerous telephone calls while negotiating a place to meet. CS1 and CS2 agreed to meet MILLS at the Valero Gas Station located at 3300 N. West Lane in Stockton. Prior to the deal, agents searched CS1 and CS2 and the vehicle used for the deal for any contraband, currency, or any unauthorized items with negative results.

31.    At approximately 7:21 p.m., agents observed MILLS pulling into the Valero gas station parking lot driving a white Chevy truck. MILLS pulled up alongside and parked next to CS2's vehicle. CS1 and CS2 exited their vehicle and contacted MILLS on the driver's side of MILLS's truck. After a brief conversation, MILLS provided 134.1 grams of suspected heroin to CS2 in exchange for $3,750 of prerecorded government money.

32.    Immediately following the exchange, MILLS drove out of the parking lot followed by surveillance units. MILLS drove directly back to his residence located at 1764 Shady Forest Way in Stockton. MILLS parked his vehicle in the driveway and walked directly into the garage. Once inside, the automatic garage door closed behind him.

33.    At approximately 8:03 p.m., surveillance units observed a 2002 dark-colored Chevy Impala arrive and park in front of MILLS' residence. The Impala displayed California license plate number 6UPN852 and DMV records list this number as registered to James SHERMAN at 1814 Nightingale, P.O. Box 31852 Stockton, CA. A few minutes later, an unidentified male

black adult exited MILLS residence and got into the front seat of the Impala. The unidentified male black adult remained in the vehicle for about six minutes before exiting and walking directly back into the residence. The Impala immediately drove out of the area followed by surveillance units.

34.  Surveillance followed the Impala. It drove directly to Ramsey Avenue in east Stockton. Agents discontinued the surveillance of the Impala as it approached SHERMAN'S known 12 acre property at San Joaquin County APN#089-100-48 located at the dead-end west side of Ramsey Avenue in an orchard.

35.  The DEA Western Regional Laboratory subsequently analyzed the substance purchased from MILLS on March 14, 2012, and confirmed it contained 136.4 grams of heroin.

36.  Analysis of the tolls from SHERMAN's telephone on March 14, 2012 showed that SHERMAN's telephone contacted MILLS's identified telephone during the period that CS1 was negotiating a location to meet to conduct the heroin transaction, and again immediately after the heroin transaction and before SHERMAN's vehicle arrived at MILLS's residence.

### April 26, 2012 - Purchase of Five Ounces of Heroin from Lindsey MILLS in Stockton

37.  On April 25, 2012, Special Agent Nehring and I met with CS2 in anticipation of purchasing five ounces of heroin from MILLS in Stockton the following day. CS2 placed a recorded telephone call to MILLS at phone number (209) 570-7459. During the recorded call, CS2 requested five ounces of heroin for the following day. MILLS said he could meet CS2 after he (MILLS) got off of work at 6:30 p.m. MILLS also said he had something else to discuss with CS2 when they met.

38.  On April 26, 2012, CS2 placed a call to MILLS to confirm their meeting later that evening. MILLS stated that he could meet with CS2 at 7:00 p.m. at the Valero Gas Station located at 3300 West Lane. MILLS mentioned he had already obtained the heroin for CS2's order.

39.  At approximately 5:15 p.m., just prior to meeting with Special Agent Nehring and me, CS2 said he/she received a call from MILLS. MILLS said he had something else to discuss with CS2 that evening. CS2 told MILLS that he/she would be very interested in anything MILLS had to offer in addition to the heroin. CS2 told Special Agent Nehring and me that he/she believed that MILLS was alluding to cocaine or cocaine base. Prior to the deal, agents searched CS2 and the vehicle used for the deal for any contraband, currency, or any unauthorized items with negative results.

40.  At approximately 6:42 p.m., agents observed MILLS arrive at his residence located at 1764 Shady Forest Way in Stockton, driving a white Chevy truck. After exiting his vehicle,

MILLS was observed walking into the residence carrying a bag. The truck displayed California license plate number 3U76835. According to DMV records, this plate number is registered to Lindsey MILLS at 1764 Shady Forest Way in Stockton.

41.    At approximately 6:47 p.m., agents observed MILLS leaving his residence in a green Jeep Cherokee. The Cherokee had been parked in the garage. The Cherokee displayed California license plate number 5WUV256. According to DMV records, this plate number is registered to Karen and Lindsey MILLS at 1764 Shady Forest Way in Stockton. Surveillance units followed MILLS directly to the Valero gas station. MILLS parked alongside CS2.

42.    CS2 exited his/her vehicle and got into the front passenger seat of MILLS's vehicle. MILLS handed heroin to CS2 in exchange for $4,650 of prerecorded government money. After the drug deal, MILLS and CS2 engaged in an extended conversation about the extent of MILLS's drug trafficking activities, his source of supply, and types of drugs and their prices. MILLS said his source of supply "has got the town sewed up" and that everyone was dealing with this source. I interpret these comments to mean that MILLS's source of supply was supplying a large number of individuals in Stockton. MILLS elaborated that his source obtained kilograms of cocaine from Mexican sources and converted the cocaine into cocaine base himself.

43.    MILLS also admitted to CS2 that he had been friends with the source for many years. MILLS said he took a three-year break to work. Since returning to selling primarily cocaine, MILLS said he had a large clientele and was making so much money that he was planning on buying a BMW 750i. MILLS said that immediately following the transaction with CS2, he (MILLS) was going to meet with his source and pay the source for the heroin. MILLS said he would pick up another order of several kilograms of cocaine for another buyer that MILLS had lined up. MILLS went on to explain that the majority of his buyers wanted cocaine in a form amenable to converting into cocaine base due because they did not want to have to worry about losing a lot of the product during the conversion process. MILLS said he could provide CS2 with any amount of either cocaine or cocaine base.

44.    After completing the drug deal and conversation with CS2, MILLS exited the parking lot and drove directly back to his residence, parking his vehicle in the garage. At approximately 7:30 p.m., surveillance units observed a blue Hyundai SUV driven by a male black adult, arrive and park in the driveway of MILLS residence. Almost immediately, surveillance observed MILLS exit the residence and get into the front passenger seat of the Hyundai. Approximately 15 minutes later, MILLS exited the vehicle and walked back into the residence. The Hyundai immediately drove out of the area. The Hyundai displayed California license plate number 5TQJ908. According to DMV records, this plate number's registered owner is Loretta SHERMAN 2701 at Ramsey Avenue in Stockton. It should be

noted that 2701 Ramsey Avenue does not correspond to an actual real property per multiple database searches (including commercial real estate databases such as Parcelquest as well as San Joaquin County property records) but surveillance of San Joaquin County Parcel #089-100-48 (deeded by SHERMAN into the name DBPH ENTERPRIZE) showed that a mailbox displaying the numerals 2701 was observed in front of the same gate surrounding the property which corresponded to 2695 Ramsey Avenue (the corresponding real property address per property records). I believe that 2701 is most likely a made-up number utilized by the occupants of this parcel (the SHERMAN's) to designate the smaller of the two side-by-side residential structures behind the frontage gate, and that SHERMAN controls and utilizes both structures, including for the purposes of registering vehicles. It should also be noted that during aerial surveillance conducted during 2012 agents clearly observed a fenced in marijuana grow between and to the rear of the two side-by-side structures which was also part of the 12.5 acre property and which is still visible on commercial satellite photos (Google Earth).

45. The DEA Western Regional Laboratory subsequently analyzed the substance purchased from MILLS on April 26, 2012, and confirmed it contained 126.1 grams of heroin.

## June 26, 2012 - Purchase of Nine Ounces of Crack Cocaine from Lindsey MILLS in Stockton

46. During mid-June 2012, MILLS called CS2 using (209) 570-7459. MILLS inquired why he had not heard from CS2 since April 2012. MILLS informed CS2 that he and his partner had a "crew" working for them. According to MILLS, they had South Stockton "sewed up," that is, under their control. MILLS said if CS2 was serious about being consistent in the drug trade, they would show CS2 how to make serious money by working for them. MILLS said kilograms of cocaine were now over $30,000 each and would soon go up to $40,000 before long. MILLS explained this was caused by the fact that Mexican suppliers were enforcing an artificial "drought" in the supply of cocaine in order to drive up the price. MILLS went on to say that, despite these prices, he and his partner could provide pure cocaine for prices lower than anyone else if CS2 became a consistent customer. MILLS stated that he and his partner were making $300,000 a month for themselves.

47. On June 23, 2012, CS2 telephonically contacted MILLS at (209) 570-7459. CS2 told MILLS that he/she would be willing to purchase up to ten ounces of cocaine base from MILLS in order to check the quality. MILLS explained that their cocaine base was currently selling for $1,300 an ounce but MILLS would be willing charge $1,200 an ounce. MILLS said he would be willing go as low as $1,100 or even below $1,000 if CS2 "got on the team."

48.　On June 25, 2012, CS2 telephonically contacted MILLS at (209) 570-7459. CS2 said he/she would be willing to set aside $10,000 to purchase cocaine base from MILLS the following day.

49.　On June 26, 2012, at approximately 3:00 p.m., CS2 telephonically contacted MILLS at (209) 570-7459 to confirm a time and place to meet later that day. MILLS said he was working until 6:30 p.m., but then had to meet his partner and pick up the cocaine base prior to meeting with CS2. MILLS said he wouldn't be available until 7:30 p.m. At approximately 3:30 p.m., CS2 received a call from MILLS. MILLS said he would be able to get off work earlier than expected and would be able to meet CS2 around 7:00 p.m. at the Valero gas station located at 3300 N. West Lane in Stockton.

50.　At approximately 7:00 p.m., CS2 telephonically contacted MILLS at (209) 570-7459 and informed him that he/she had arrived at the meet location. MILLS said he had just obtained the cocaine base at that moment and would arrive at the meet location in approximately 15 minutes.

51.　At approximately 6:42 p.m., surveillance units at SHERMAN's residence (2695 Ramsey Road) observed a light green BMW with paper plates turn onto Ramsey Avenue and park in front of SHERMAN's residence. At approximately 6:55 p.m., surveillance units observed the same light green BMW pulling away from the residence driven by a male black adult with a bald head. Surveillance followed the BMW directly to the Valero gas station and watched it pull alongside CS2's parked vehicle and stop. Established surveillance units located at the Valero positively identified the driver of the BMW as MILLS as he pulled into the parking lot.

52.　After arriving in the Valero lot, MILLS exited his vehicle and contacted CS2. MILLS and CS2 engaged in a brief conversation about MILLS's new BMW. MILLS then directed CS2 to a black plastic bag on the floorboard of the BMW. The bag contained 279.1 grams of suspected cocaine base. CS2 then paid MILLS $10,000 in prerecorded government money in exchange for the cocaine.

53.　Immediately after the exchange, MILLS drove directly to his residence located at 1764 Shady Forest Way in Stockton, parked in the driveway and walked directly into the house through the open garage door arriving at 7:18 p.m.

54.　At approximately 7:48 p.m., agents observed MILLS leaving the residence driving the light green BMW. Surveillance units followed MILLS to the corner of Flora Street and Sutter Street in Stockton where he met with an unidentified male black adult for approximately 15 minutes. MILLS was then followed by surveillance units to SHERMAN's residence located at 2695 Ramsey Avenue in Stockton. MILLS pulled up to the closed driveway gate, waited

for a few moments while the gate opened and then pulled onto the property and parked in front of the residence. Within moments, agents observed MILLS meeting with a male black adult who had exited the residence.

55.     The DEA Western Regional Laboratory subsequently analyzed the substance purchased from MILLS on June 26, 2012, and determined it contained 222.7 grams of cocaine base.

### Recent Information from CS1 about MILLS and SHERMAN's Drug Trafficking

56.     During the month of April, 2013, Special Agent Brian Nehring spoke with CS1. CS1 stated that he/she had recently met with MILLS in Stockton. MILLS told CS1 that his "og partner's" (referring to SHERMAN) main source of supply was no longer available to him and he had begun using a new source of supply. MILLS further explained that MILLS was also using this same source of supply, a Mexican national male adult whom he did not name, but that he (MILLS) and SHERMAN were still working together. CS1 relayed the fact that MILLS had been asking where CS2 was and was asking CS1 why CS2 had not called MILLS in months. CS1 explained to MILLS that MILLS had been using a source of supply closer to where he/she was living and that CS2 had been obtaining heroin and cocaine base at a cheaper price. CS1 then indicated to MILLS that CS2 had cut ties with that source of supply and that he/she was again looking for a new source. CS1 relayed to MILLS that CS2 was interested in connecting with MILLS again for the purpose of purchasing large amounts of cocaine base. MILLS told CS1 that he could provide any amount of cocaine that CS2 needed and that CS2 should call him (MILLS) so they could set it up.

### June 27, 2013 - Purchase of Eight Ounces of Cocaine Base from Lindsey MILLS in Stockton

57.     Beginning on June 24, 2013, CS2 engaged in a series of drug-related calls with MILLS. During the course of the phone calls, CS2 arranged to purchase eight ounces of cocaine base for $8,000 on June 27, 2013. MILLS agreed to meet with CS2 at approximately 6:30 p.m. after he (MILLS) finished working for the day.

58.     On June 27, 2013, at approximately 4:30 p.m., agents established surveillance in the area of MILLS's residence located at 1764 Shady Forest Way in Stockton. At that time, no vehicles were seen in the driveway. However, at approximately 5:12 p.m., surveillance units observed a green Jeep Laredo arrive at the location and park in the garage. FBI Special Agent Toy observed a white female adult exit the driver door and walk around the rear of the vehicle before the garage door closed. The Laredo displayed license plate number 5WUV256. According to DMV records, this license plate number is registered to Karen L.MILLS and Lindsey E. MILLS 1764 Shady Forest Way in Stockton.

59.  At approximately 4:50pm, Special Agent Nehring instructed CS2 to place a telephone call to
     MILLS (recorded and monitored by Special Agent Nehring) at (209) 570-7459. MILLS
     stated that he would be getting off work at 6:30pm and would meet CS3 soon thereafter, at
     the same location they had met the last time MILLS sold cocaine base to the CS2 (3300 N.
     West Lane Stockton, California).

60.  At approximately 6:38 p.m., surveillance units observed a green BMW 7-series, with paper
     plates that read "VALLEYBMW.NET," driving into the neighborhood of 1764 Shady
     Forrest Way. Surveillance units observed the vehicle park in the driveway of 1764 Shady
     Forrest Way. SA Toy positively identified the driver of the green BMW as Lindsey MILLS
     based on a California DL photograph (#N4669067). MILLS was observed wearing a
     maroon short sleeve shirt with a patch on the left sleeve with the letters "RTD". After
     exiting the vehicle, MILLS was seen carrying a cylindrical shaped container as he walked to
     the trunk of the vehicle. MILLS removed a white plastic bag containing an unknown
     substance from the trunk. MILLS then moved the green garbage can from the street to the
     side of his residence before entering through the open garage door.

61.  At approximately 6:00 p.m., Special Agent Nehring and TFO Malmquist searched CS2's
     person and vehicle for contraband, money, and weapons. None were found. Special Agent
     Nehring provided CS2 with $8,000 of prerecorded government money to make the purchase
     of the approximately eight ounces of cocaine base from MILLS. CS2 was outfitted with a
     concealed transmitter and recorder which allowed the ensuing meeting and purchase to be
     recorded.

62.  At approximately 6:46 p.m., surveillance units observed MILLS exit the garage of 1764
     Shady Forest Way wearing the same clothing and carrying the same white plastic bag.
     Special Agent Toy noticed that the contents of the bag appeared to be smaller than when
     MILLS removed the bag from the trunk. MILLS got into the green BMW, backed out of the
     driveway, and drove away from the residence as the garage door was closing.

63.  At approximately 6:20 p.m., Special Agent Nehring, TFO Malmquist and METRO
     Detectives Verber and Eastin followed CS2 from the pre-stage location to the Valero
     parking lot located at 3300 N. West Lane in Stockton, arriving at approximately 6:25 p.m.
     At approximately 6:48 p.m., surveillance units observed a light green BMW with paper
     plates pull into the Valero gas station parking lot and park next to CS2's vehicle. A black
     male adult wearing a maroon short sleeve shirt exited the driver's seat. Metro Detective
     Verber positively identified the driver of the green BMW as Lindsey MILLS.

64.  After arriving in the Valero parking lot, MILLS exited his vehicle and contacted CS2. CS2
     and MILLS engaged in a brief conversation before CS2 reached into MILLS vehicle and
     removed a white plastic bag containing approximately eight ounces (279.3gg) of suspected

cocaine base. At the same time, CS2 placed $8,000 as payment for the eight ounces of cocaine base in the vehicle. CS2 and MILLS then spoke for a few more minutes before MILLS was observed getting back into his vehicle and exiting the parking lot followed by surveillance units. CS2 remained in the parking lot for approximately two minutes before exiting and driving directly to a pre-determined location followed by SA Nehring and TFO Malmquist.

65.     After arriving at the pre-determined location, CS2 immediately turned over the approximate eight ounces (279.3gg) of cocaine base that CS2 had purchased from MILLS. CS2 and CS2's vehicle were again searched for weapons, money and contraband. None were found.

66.     Surveillance followed MILLS directly from the Valero to a Stockton neighborhood directly south of Highway 4 and west of Highway 99 before losing sight of his vehicle. Special Agent Brian Nehring was monitoring court-authorized global positioning data (GPS data) for SHERMAN's cellular telephone, (209) 993-9753, and noted that the GPS data showed SHERMAN's cell phone in the same area that surveillance lost sight of MILLS. Based on the previous controlled purchases from MILLS by CS2, I believe MILLS was planning to meet with SHERMAN in that area of Stockton to pay SHERMAN, MILLS's source of supply, for the cocaine base that he had just sold to CS2. This hypothesis is supported by an analysis of MILLS and SHERMAN'S cellular history.

67.     On June 26, 2013, after speaking with CS2 when CS2 confirmed the order for eight ounces of cocaine base from MILLS the following day, cellular telephone record analysis showed that MILLS immediately called SHERMAN. After speaking with SHERMAN, MILLS called CS2 and stated that he could do the deal for the agreed upon price of $1,000 per ounce.

68.     Immediately after the sale of eight ounces of cocaine base to CS2, an analysis of SHERMAN'S cellular telephone showed that SHERMAN's cellular telephone received a call from MILLS at 7:13 p.m., just minutes after the transaction and as agents were following MILLS away. SHERMAN then called MILLS at 7:20 p.m. This coincides with the approximate time surveillance units following MILLS lost sight of MILLS driving in the same area of Stockton that the global positioning of SHERMAN's phone indicated SHERMAN was at that same time.

**July 2013 narcotics-related calls with MILLS regarding up-coming transaction scheduled for July 11th, 2013**

69.     CS2 was telephonically contacted by MILLS on July 7th, 2013 at which time MILLS solicited CS2 to conduct a much larger cocaine base transaction. CS2 told MILLS that he/she would consider utilizing MILLS as the source of supply for at least a kilogram or

more of cocaine base for a deal he/she was attempting to conduct the following week.
MILLS informed CS2 that his source, whom he referred to as his long-time partner and as
the same age as MILLS, would be prepared to supply MILLS with any amount of cocaine
base that CS2 might want. CS2 related that he/she spoke again with MILLS on July 8th,
2013 at which time MILLS indicated he would speak with his source to confirm the prices.
MILLS called CS2 back and told CS2 that per his source a kilogram of cocaine base would
be $31,500.00. MILLS also informed CS2 that his source had plenty of heroin available as
well.

70.   On July 9th, 2013, CS2 telephonically contacted MILLS in SA Nehring's presence and
during a recorded telephone call told MILLS that he/she would want at a kilogram and a
half of cocaine base on July 11th, 2013. MILLS agreed to a price of $46,000.00 for this
amount of cocaine base. CS2 told MILLS that he/she would probably want at least ten
ounces of heroin as well on that date but would let MILLS know. MILLS indicated that his
source was taking care of having the cocaine base ready that day and that the heroin was
always available at any amount the CS ordered. MILLS and CS2 agreed to meet on July
11th, 2013 at approximately 9:30 am before MILLS went to work.

**Training and Experience Regarding Drug Trafficking and Drug Traffickers**

71.   As a result of my experience and training, I have learned that traffickers who deal in various
quantities of controlled substances, or those that assist in that venture, maintain and tend to
retain accounts or records of those transactions. Such records detail amounts outstanding,
owed, or expended, along with records tending to indicate the identity of co-conspirators.
These records may be kept on paper or contained in memory calculators or computers. It is
also my experience that these traffickers tend to keep these accounts and records in their
residence and in the areas under their control. It is my training and experience, that in the
case of drug dealers, evidence is likely to be found where the dealers live.  United States v.
Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).  It is also my training and experience
that where criminal activity is long-term or ongoing, equipment and records of the crime
will be kept for some period of time. United States v. Greany, 929 F.2d 523, 525 (9th Cir.
1991).

72.   Based upon my experience and training, I have learned that drug traffickers often place their
assets in names other than their own to avoid detection of those assets by law enforcement
and the Internal Revenue Service (IRS); that those persons are commonly family members,
friends, and associates who accept title of assets to avoid discovery and detection; that
traffickers also often place assets in the ownership of corporate entities to avoid detection by
law enforcement agencies and although these assets are in other individual(s) or corporate
names, the traffickers continue to use these assets and exercise dominion and control over

them. Typically traffickers keep records of those registrations and transactions in their residence.

73.   I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

74.   In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

75.   In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, heroin and cocaine base and which they intend to distribute. It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

76.   In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

77.   In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

78.   In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my

experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution.   During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other then themselves in an effort to avoid detection by law enforcement.

79.   In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

80.   In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

81.   Individuals involved in the distribution of heroin, cocaine and cocaine base often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their methamphetamine distribution, use, possession, or any other activities surrounding their cocaine and methamphetamine trafficking activities, and that such items often identify co-conspirators in their methamphetamine trafficking activities.

82.   It has been my experience in the past, and particularly in this case, that when suspects utilize mobile telephones to communicate with cooperating individuals or undercover agents to set up the heroin and cocaine base deals, records relating to these activities will be found stored in the cellular telephone.

83.   I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave

messages when the telephone user does not answer.  Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity.  Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker.  Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime.  Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

84.     As described above and in Attachment A, this Affidavit seeks permission to search and seize things that are related to the ongoing heroin and cocaine base conspiracy between MILLS and SHERMAN, in whatever form such things are stored.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

85.     It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including heroin and cocaine base, as well as the proceeds from such illegal operations.

86.     The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation.  This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

87.     Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in Attachment B.  Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all the items listed in Attachment B to this Affidavit and incorporated here by reference.

**<u>Conclusion</u>**

88. In this case, there is probable cause to believe the locations listed in Attachment A to this Affidavit contains evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically, Lindsey Earl MILLS and James Randolph SHERMAN and their ongoing collective agreement to distribute and possess with intent to distribute heroin and cocaine base in violation of 21 U.S.C. §§ 846 and 841(a)(1).

89. Specifically, I respectfully request authority to search:

   A. The current residence of MILLS located at **1764 Shady Forest Way, Stockton, California,** further described as a single family, single story residence, tan in color with white and blue trim, with a blue front door, with the numerals 1764 in black on a white background affixed to the front of the structure;

   B. **San Joaquin County parcel APN#089-100-48** in San Joaquin County, California, corresponding to a listed address of **2695 Ramsey Avenue, Stockton, California** per San Joaquin County Property Records, further described as a 12.5 acre rural parcel located at the north west termination of Ramsey Avenue, with two structures contained on the parcel, both grey stucco in color with tan roofs and sharing a semi-circular driveway, accessed by a wrought-iron frontage gate, with black mail boxes in front displaying the numbers 2695 and 2701;

   C. The person of Lindsey Earl MILLS;

   D. The person of James Randolph SHERMAN; and

   E. All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.

90.   I further request that based upon this Affidavit, a Criminal Complaint and arrest warrants be issued for Lindsey Earl MILLS and James Randolph SHERMAN charging them with:

COUNT ONE: BOTH DEFENDANTS: Between approximately March 14, 2012 and the present, conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

COUNT TWO: BOTH DEFENDANTS: Between approximately June 26, 2012 and the present, conspiracy to distribute and possess with intent to distribute at least 280 grams mixture and substance containing a detectable amount of cocaine base, a Schedule I Controlled Substance, in violation of 21 U.S.C §§ 846 and 841(a)(1).

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

Gary Malmquist, Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before
me on the ___10___ day of July, 2013

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

Jason Hitt
Assistant U.S. Attorney

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>**Phone 1 - Black Samsung cellular telephone bearing serial number 268435459510885137, seized pursuant to a federal warrant from Lindsey Mills on July 15, 2013, and currently in the custody of DEA; and**<br><br>**Phone 2 - Samsung MetroPCS cellular telephone bearing serial number 2684354595905903452, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA; and**<br><br>**Phone 3 - LG MetroPCS cellular telephone bearing serial number 268435460007533541, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA; and**<br><br>**A Digital Video Recording Device ("DVR") - One DVR located in the master bedroom office of James Sherman within his residence at 2695 Ramsey Road, Stockton, California, during service of a federal search warrant on July 15, 2013, and currently in the custody of DEA.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.<br><br>2:19 - SW  789 ___ AC ___ |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

**SEE ATTACHMENTS B and C, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ September 24, 2019 _____ *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐  Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐  for _____ days *(not to exceed 30)*  ☐  until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____9/10/19_____          _____
                                                                                          *Judge's signature*

City and state:     Sacramento, California          Allison Claire, U.S. Magistrate Judge
                                                                                    *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

| _____ | _____ |
|---|---|
| Signature of Judge | Date |

**Attachment A**
**Locations to be Searched**

Phone 1   -   Black Samsung cellular telephone bearing serial number 268435459510885137, seized pursuant to a federal warrant from Lindsey Mills on July 15, 2013, and currently in the custody of DEA; and

Phone 2   -   Samsung MetroPCS cellular telephone bearing serial number 268435459505903452, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA.

Phone 3   -   LG MetroPCS cellular telephone bearing serial number 268435460007533541, seized pursuant to a federal warrant from the residence of Lindsey Mills (1764 Shady Forest, Stockton, California), on July 15, 2013, and currently in the custody of DEA.

Digital Video Recording Device ("DVR")   -   One DVR located in the master bedroom office of James Sherman within his residence at 2695 Ramsey Road, Stockton, California, during service of a federal search warrant on July 15, 2013, and currently in the custody of DEA.

**Attachment B**
**Items to be Seized**

Agents are authorized to search and seize property that phones identified in Attachment A for violations of the following federal statutes (the "Target Offenses"), committed by Lindsey Mills and James Sherman and their co-conspirators:

- Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute Heroin and a form of Cocaine Base known as "Crack" Cocaine.

- Title 21 U.S.C. Section 841(a)(1) – Distribution and Possession with Intent to Distribute Heroin or Crack Cocaine.

- Title 21 U.S.C. Section 843 – Use of a Communication Facility to Facilitate a Drug Trafficking Crime, specifically, Distribution of Heroin and Crack Cocaine.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Address books and other such address listings, letters, cables, telegrams, photographs, audio, and videos connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

2. All names, words, telephone numbers, email addresses, time/date information, text messages, or any other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones described in Attachment A. This authority to search the phones identified in Attachment A includes the following within each phone:

   A. Incoming call history;
   B. Outgoing call history;
   C. Missed call history;
   D. Outgoing text messages;
   E. Incoming text messages;
   F. Draft text messages;
   G. Telephone book;
   H. Data screen or file identifying the telephone number associated with the mobile telephone searched;
   I. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;
   J. Voicemail;
   K. User-entered messages (such as to-do lists);
   L. Photographs; and
   M. Any passwords used to access the electronic data described above; and

3. Video recordings and data from the DVR described in Attachment A that shows James Sherman engaged in drug trafficking activity, or associated with individuals engaged in

drug trafficking in the following locations: outside the house and inside the garage, office, kitchen, and home gym.

///

///

///

///

///

///

///

**Attachment C**

AO 91 (Rev. 12/03) Criminal Complaint 8/07

Case 2:13-cr-00302-MCE   Document 1   Filed 07/10/13   Page 1 of 20

# UNITED STATES DISTRICT COURT

**SEALED / FILED**

## EASTERN DISTRICT OF CALIFORNIA

JUL 1 0 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA

v.

James Randolph SHERMAN
Lindsey MILLS

## CRIMINAL COMPLAINT

CASE NUMBER:

2 13 - MJ - 0 2 0 8    KJN

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief.  On or about **see below** in **San Joaquin** County, in the Eastern District of California defendant(s) did,
(Track Statutory Language of Offense)

COUNT ONE: Between approximately March 14, 2012 and the present, knowingly and intentionally engage in a conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

COUNT TWO: Between approximately June 26, 2012 and the present, engage in a conspiracy to distribute and possess with intent to distribute at least 280 grams mixture and substance containing a detectable amount of cocaine base, a Schedule I Controlled Substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

I further state that I am a(n) DEA Task Force Officer and that this complaint is based on the following facts:

▸ **SEE ATTACHMENT**

Continued on the attached sheet and made a part of this complaint:    X _____

Gary Malmquist, DEA Task Force Officer

Sworn to before me, and signed in my presence
July 10, 2013                                        at    Sacramento, California

Date                                                         City                    State

U.S. Magistrate Judge Kendall J. Newman

Name of Judge          Title of Judge               Signature of Judge

### Affidavit of DEA Task Force Officer Gary Malmquist In Support of a Search Warrant and Criminal Complaint

I, Gary Malmquist, being duly sworn state the following:

### Background and Expertise

1. I am a Task Force Agent of the Drug Enforcement Administration and have been so assigned since November of 2010. I am employed by the Sacramento Police Department in the Office of Investigations as a Narcotics Detective since January 2004. I have been a sworn Peace Officer in California since 1997. I am currently assigned to the San Francisco Field Division, Sacramento District Office of the DEA, specifically assigned to investigate federal narcotics offenses.

2. I have received specialized training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal, from the California Department of Justice (DOJ) and California Department of Corrections and Rehabilitation (CDCR). In addition, I graduated from the California DOJ Narcotics Investigators Course. In total, I have received in excess of 100 hours of comprehensive formalized classroom instruction in those areas outlined above.

3. I have assisted in the execution of more than one hundred (100) warrants to search particular places or premises for controlled substances and/or related paraphernalia, indicia and other evidence of violations of federal drug narcotics statutes. As a result, I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the traffickers' effort to make a profit from those dealings or transactions, either for the purchase of additional substances or material gain.

4. I have been qualified as and have testified as an expert witness in both federal and state court in the Northern District of California and in Sacramento County. These areas of qualification have included possession for sale, possession with intent to distribute and manufacturing of a controlled substance.

## Scope of Requested Criminal Complaint and Search Warrant

5.  This Affidavit is submitted in support of a Criminal Complaint charging **Lindsey Earl MILLS** and **James Randolph SHERMAN** with:

COUNT ONE: BOTH DEFENDANTS: Between approximately March 14, 2012 and the present, conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of 21 U.S.C. §§846 and 841(a)(1).

COUNT TWO: BOTH DEFENDANTS: Between approximately June 26, 2012 and the present, conspiracy to distribute and possess with intent to distribute at least 280 grams mixture and substance containing a detectable amount of cocaine base, a Schedule I Controlled Substance, in violation of 21 U.S.C §§846 and 841(a)(1).

6.  This Affidavit is also submitted in support of a search warrant to search the following locations

A.  The current residence of MILLS located at **1764 Shady Forest Way, Stockton, California;**

B.  **San Joaquin County parcel APN#089-100-48** in San Joaquin County, California, which corresponds to a listed address of **2695 Ramsey Avenue, Stockton, California** according to San Joaquin County Property Records. It is a 12.5 acre rural parcel located at the north west termination of Ramsey Avenue;

C.  The person of Lindsey Earl MILLS;

D.  The person of James Randolph SHERMAN; and

E.  All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.

## Background of the Investigation

## 2011 Information from CS1 Regarding Lindsey MILLS and James Sherman's Current Drug Trafficking Activities and Identification of Residences

15.  In late November of 2011, Special Agent Brian Nehring was contacted by a confidential source ("CS1") who provided information regarding the ongoing drug trafficking activities of Lindsey MILLS.

16. Beginning in 2011 and continuing through the present, CS1 agreed to cooperate with DEA after being indicted on a federal drug charge. CS1 is providing information and cooperation with the hope of receiving a reduced sentence for the pending federal felony charges. The assigned Assistant United States Attorney has authorized CS1's effort to cooperate on his/her case. CS1 has been arrested and convicted of Auto Theft (1978), Possession of a Firearm (1978), Receiving Stolen Property (1980), Armed Robbery and Kidnapping (1981), Possession for Sale –Cocaine Base, Battery on a Police Officer (1991), Auto Theft (1995), Sexual Penetration w/Foreign Object on a Minor and Oral Copulation (1996), Possession/Manufacture Dangerous Weapon (2002) and one Federal charge of Attempt/Conspiracy to Distribute Drugs (2006).

17. During this investigation, CS1 has spoken with and met MILLS and other suspected customers of James SHERMAN at the direction of either I or Special Agent Brian Nehring. CS1 provided introductions for additional Confidential Sources, including CS2 described below, to MILLS and others. Information provided by CS1 has proven reliable and was independently corroborated through telephone records, physical surveillance, public records and information provided by other confidential sources and sources of information. I am not aware of CS1 providing false or intentionally misleading information in this investigation. For these reasons, I consider CS1's information in this investigation to be reliable.

18. CS1 related that he/she had recently been contacted by an individual CS1 had known for several years named Lindsey MILLS. According to CS1, Lindsey MILLS was male Black adult, approximately 50 years of age, who was currently a large distributor of cocaine and cocaine base in the Stockton area. CS1 said MILLS had been distributing crack cocaine for many years. MILLS told CS1 that he (MILLS), had numerous distribution spots where he paid individuals to sell his cocaine. During the conversation with CS1, MILLS said he had been obtaining kilograms of cocaine from "the biggest OG in Stockton" and that he and this source of supply had grown up together and were the same age. MILLS went on to say this source owned a large ranch located in an orchard just off the highway, a few miles east of Stockton.

19. CS1 related that MILLS's source of supply was also allegedly the source of supply for other specific heroin and cocaine base dealers in the Stockton area. The dealers identified by CS1 were previously investigated by DEA during 2011. In that investigation, the dealers were suspected of being supplied by James SHERMAN based upon controlled purchases, surveillance, and phone toll analysis. During that investigation, agents observed SHERMAN meeting with a suspected sub-dealer before and after controlled purchases of drugs in Stockton. As a result, it was determined that SHERMAN resided at **San Joaquin County parcel APN#089-100-48** in San Joaquin County, California, corresponding to a listed address of **2695 Ramsey Avenue, Stockton, California** per San Joaquin County Property

Records, further described as a 12.5 acre rural parcel located at the north west termination of Ramsey Avenue. This is a large ranch-type property in an orchard on a dead-end road a few miles east of Stockton off of Highway 26. This property was consistent with CS1's description of the residence for MILL's source (a ranch located in an orchard) and is located in the same area (a few miles east of Stockton). As detailed below, during 2011 (and through 2012 and as recently as June 2013) agents observed SHERMAN and his vehicles at this ranch property. Property records analysis showed that SHERMAN had been the owner of this property but subsequently transferred title of this property and three others he owned into the name of DBPH ENTERPRIZES INC. in recent years, though he continued to reside at this location according to DMV inquiries and multiple database checks.

20. According to CS1, MILL's cellular telephone number was (209) 570-7459. Special Agent Nehring examined a pen register then active on the identified cellular telephone of James SHERMAN, (209) 993-9753, as a result of the investigation of a separate individual believed to be supplied by SHERMAN at that time. After examining the pen register information for SHERMAN's number, Special Agent Nehring learned that SHERMAN's cellular telephone was in current high-frequency contact with (209) 570-7459 (identified by CS1 as the cellular telephone number belonging to Lindsey MILLS). Metro PCS records subsequently confirmed this phone number was subscribed in MILLS's name. The contact between the MILLS number and the SHERMAN number was more frequent contact than the identified telephones for other sub-dealers.

21. CS1 further explained that he/she met with MILLS in October of 2011. When the two met, MILLS took CS1 to locations in Stockton that he (MILLS) used to distribute cocaine and cocaine base. MILLS went on to say that has been making several hundreds of thousands of dollars each month from these locations and that he was obtaining the kilos of cocaine from his source of supply.

22. Inquiries with the California Department of Justice revealed that SHERMAN has criminal history including a felony conviction on or about September 6, 1996, for Transportation of a Controlled Substance, for which he received a three-year prison to three years prison (suspended sentence) and five years probation.

23. MILLS also has criminal history that includes misdemeanor convictions for receiving stolen property, possession of a controlled substance, being under the influence of a controlled substance and domestic violence. Most of the convictions resulted in probation and/or diversion sentences.

24. Inquiries with the California DMV revealed that MILLS had consistently provided **1764 Shady Forest Road, Stockton, California** as his resident address through the present.

MILLS currently lists multiple vehicles registered to himself at this address. Agents observed MILLS and his vehicles at this location during 2012 and through June of 2013.

### 2012 Controlled Purchases of Heroin and Cocaine Base from Lindsey MILLS in which James SHERMAN is Identified as Source of Supply

25.   During early 2012, CS1 related that he/she had been approached by MILLS on multiple occasions during which MILLS informed CS1 that he (MILLS) was aware of an associate of CS1's buying heroin from another sub-dealer supplied by SHERMAN in the Stockton area. According to CS1, MILLS was upset that CS1's associate was going to this person when CS1 knew that MILLS was much closer to SHERMAN. MILLS informed CS1 that, although he dealt primarily in kilogram quantities of cocaine with the source of supply, he could obtain any amount of heroin from the same source and the quality would be much higher. This would allow CS1's associate to "cut" the heroin and thus obtain a higher profit. MILLS referred to the supplier as, "the OG who lives on the ranch east of town." In my training and experience, the term "OG" typically refers to someone who has earned respect within a particular criminal community because of their long term involvement in criminal activity. The letters "OG" are an abbreviation for the term "original gangster." It should be noted that the reference to "gangster" in this term does not necessarily mean the individual is an actual gang member; rather, it means they have been involved in criminal activity for a significant period of time and have earned respect among other criminals. The person may, or may not, be a member of a gang. After hearing the information from MILLS, CS1 agreed to introduce his/her associate ("CS2") to MILLS in March of 2012, which subsequently occured.

26.   Between March 2012 to June of 2013, CS2 made controlled purchases from MILLS at DEA's direction totaling 348.8 grams of heroin and more than 400 grams of cocaine base. All of these drug deals occurred in the parking lot of the Valero gas station located at 3300 N. West Lane in Stockton. As described below, surveillance units observed MILLS either meeting with SHERMAN at SHERMAN'S residence (2695 Ramsey Avenue, Stockton) just prior to conducting a transaction with CS2 or immediately following a narcotic transaction with the CS2 in which MILLS met with SHERMAN at MILLS' residence (1764 Shady Forest Road Stockton).

27.   CS2's criminal record includes arrests and convictions for Hit and Run (1989), Robbery/Auto Theft (1992), Possession for Sales-Cocaine and Possession of a Firearm (1993) and Domestic Violence (2004). Information provided by CS2 has proven reliable and has been independently corroborated through telephone records, physical surveillance, public records, and information provided by other confidential sources and sources of information. I have not found the CS2's information to be false or intentionally misleading. In a past investigations, CS2 has made controlled purchases of controlled substances at

Special Agent Nehring's direction. CS2's information and assistance during those investigations was utilized in obtaining state and federal search warrants and arrest warrants. As a result of those search warrants, law enforcement seized controlled substances, including cocaine, cocaine base and methamphetamine and firearms, and individuals have been successfully prosecuted for narcotics offenses. For these reasons, I consider CS2's information in this investigation reliable.

### March 14, 2012 – CS2 Purchases Four Ounces of Heroin from Lindsey MILLS in Stockton

28.     On March 14, 2012, Special Agent Nehring and I met with CS1 and CS2 in anticipation of purchasing four ounces of heroin from MILLS in Stockton.

29.     At this time, CS1 indicated that he/she had spoken with MILLS on March 12 and March 13 over cell phone number (209) 570-7459 and informed MILLS that he/she would be in Stockton on March 14 and was interested in purchasing four ounces of heroin. During the conversation between CS1 and MILLS, MILLS confirmed that he had spoken with his source of supply and would be picking up the heroin later that night (March 13) or during the day on the March 14.

30.     In anticipation of meeting with MILLS, on March 14, 2012, between 6:00 p.m. and 7:00 p.m., CS1 and MILLS exchanged numerous telephone calls while negotiating a place to meet. CS1 and CS2 agreed to meet MILLS at the Valero Gas Station located at 3300 N. West Lane in Stockton. Prior to the deal, agents searched CS1 and CS2 and the vehicle used for the deal for any contraband, currency, or any unauthorized items with negative results.

31.     At approximately 7:21 p.m., agents observed MILLS pulling into the Valero gas station parking lot driving a white Chevy truck. MILLS pulled up alongside and parked next to CS2's vehicle. CS1 and CS2 exited their vehicle and contacted MILLS on the driver's side of MILLS's truck. After a brief conversation, MILLS provided 134.1 grams of suspected heroin to CS2 in exchange for $3,750 of prerecorded government money.

32.     Immediately following the exchange, MILLS drove out of the parking lot followed by surveillance units. MILLS drove directly back to his residence located at 1764 Shady Forest Way in Stockton. MILLS parked his vehicle in the driveway and walked directly into the garage. Once inside, the automatic garage door closed behind him.

33.     At approximately 8:03 p.m., surveillance units observed a 2002 dark-colored Chevy Impala arrive and park in front of MILLS' residence. The Impala displayed California license plate number 6UPN852 and DMV records list this number as registered to James SHERMAN at 1814 Nightingale, P.O. Box 31852 Stockton, CA. A few minutes later, an unidentified male

black adult exited MILLS residence and got into the front seat of the Impala. The unidentified male black adult remained in the vehicle for about six minutes before exiting and walking directly back into the residence. The Impala immediately drove out of the area followed by surveillance units.

34.     Surveillance followed the Impala. It drove directly to Ramsey Avenue in east Stockton. Agents discontinued the surveillance of the Impala as it approached SHERMAN'S known 12 acre property at San Joaquin County APN#089-100-48 located at the dead-end west side of Ramsey Avenue in an orchard.

35.     The DEA Western Regional Laboratory subsequently analyzed the substance purchased from MILLS on March 14, 2012, and confirmed it contained 136.4 grams of heroin.

36.     Analysis of the tolls from SHERMAN's telephone on March 14, 2012 showed that SHERMAN's telephone contacted MILLS's identified telephone during the period that CS1 was negotiating a location to meet to conduct the heroin transaction, and again immediately after the heroin transaction and before SHERMAN's vehicle arrived at MILLS's residence.

### April 26, 2012 - Purchase of Five Ounces of Heroin from Lindsey MILLS in Stockton

37.     On April 25, 2012, Special Agent Nehring and I met with CS2 in anticipation of purchasing five ounces of heroin from MILLS in Stockton the following day. CS2 placed a recorded telephone call to MILLS at phone number (209) 570-7459. During the recorded call, CS2 requested five ounces of heroin for the following day. MILLS said he could meet CS2 after he (MILLS) got off of work at 6:30 p.m. MILLS also said he had something else to discuss with CS2 when they met.

38.     On April 26, 2012, CS2 placed a call to MILLS to confirm their meeting later that evening. MILLS stated that he could meet with CS2 at 7:00 p.m. at the Valero Gas Station located at 3300 West Lane. MILLS mentioned he had already obtained the heroin for CS2's order.

39.     At approximately 5:15 p.m., just prior to meeting with Special Agent Nehring and me, CS2 said he/she received a call from MILLS. MILLS said he had something else to discuss with CS2 that evening. CS2 told MILLS that he/she would be very interested in anything MILLS had to offer in addition to the heroin. CS2 told Special Agent Nehring and me that he/she believed that MILLS was alluding to cocaine or cocaine base. Prior to the deal, agents searched CS2 and the vehicle used for the deal for any contraband, currency, or any unauthorized items with negative results.

40.     At approximately 6:42 p.m., agents observed MILLS arrive at his residence located at 1764 Shady Forest Way in Stockton, driving a white Chevy truck. After exiting his vehicle,

MILLS was observed walking into the residence carrying a bag. The truck displayed California license plate number 3U76835. According to DMV records, this plate number is registered to Lindsey MILLS at 1764 Shady Forest Way in Stockton.

41.    At approximately 6:47 p.m., agents observed MILLS leaving his residence in a green Jeep Cherokee. The Cherokee had been parked in the garage. The Cherokee displayed California license plate number 5WUV256. According to DMV records, this plate number is registered to Karen and Lindsey MILLS at 1764 Shady Forest Way in Stockton. Surveillance units followed MILLS directly to the Valero gas station. MILLS parked alongside CS2.

42.    CS2 exited his/her vehicle and got into the front passenger seat of MILLS's vehicle. MILLS handed heroin to CS2 in exchange for $4,650 of prerecorded government money. After the drug deal, MILLS and CS2 engaged in an extended conversation about the extent of MILLS's drug trafficking activities, his source of supply, and types of drugs and their prices. MILLS said his source of supply "has got the town sewed up" and that everyone was dealing with this source. I interpret these comments to mean that MILLS's source of supply was supplying a large number of individuals in Stockton. MILLS elaborated that his source obtained kilograms of cocaine from Mexican sources and converted the cocaine into cocaine base himself.

43.    MILLS also admitted to CS2 that he had been friends with the source for many years. MILLS said he took a three-year break to work. Since returning to selling primarily cocaine, MILLS said he had a large clientele and was making so much money that he was planning on buying a BMW 750i. MILLS said that immediately following the transaction with CS2, he (MILLS) was going to meet with his source and pay the source for the heroin. MILLS said he would pick up another order of several kilograms of cocaine for another buyer that MILLS had lined up. MILLS went on to explain that the majority of his buyers wanted cocaine in a form amenable to converting into cocaine base due because they did not want to have to worry about losing a lot of the product during the conversion process. MILLS said he could provide CS2 with any amount of either cocaine or cocaine base.

44.    After completing the drug deal and conversation with CS2, MILLS exited the parking lot and drove directly back to his residence, parking his vehicle in the garage. At approximately 7:30 p.m., surveillance units observed a blue Hyundai SUV driven by a male black adult, arrive and park in the driveway of MILLS residence. Almost immediately, surveillance observed MILLS exit the residence and get into the front passenger seat of the Hyundai. Approximately 15 minutes later, MILLS exited the vehicle and walked back into the residence. The Hyundai immediately drove out of the area. The Hyundai displayed California license plate number 5TQJ908. According to DMV records, this plate number's registered owner is Loretta SHERMAN 2701 at Ramsey Avenue in Stockton. It should be

noted that 2701 Ramsey Avenue does not correspond to an actual real property per multiple database searches (including commercial real estate databases such as Parcelquest as well as San Joaquin County property records) but surveillance of San Joaquin County Parcel #089-100-48 (deeded by SHERMAN into the name DBPH ENTERPRIZE) showed that a mailbox displaying the numerals 2701 was observed in front of the same gate surrounding the property which corresponded to 2695 Ramsey Avenue (the corresponding real property address per property records). I believe that 2701 is most likely a made-up number utilized by the occupants of this parcel (the SHERMAN's) to designate the smaller of the two side-by-side residential structures behind the frontage gate, and that SHERMAN controls and utilizes both structures, including for the purposes of registering vehicles. It should also be noted that during aerial surveillance conducted during 2012 agents clearly observed a fenced in marijuana grow between and to the rear of the two side-by-side structures which was also part of the 12.5 acre property and which is still visible on commercial satellite photos (Google Earth).

45.    The DEA Western Regional Laboratory subsequently analyzed the substance purchased from MILLS on April 26, 2012, and confirmed it contained 126.1 grams of heroin.

### June 26, 2012 - Purchase of Nine Ounces of Crack Cocaine from Lindsey MILLS in Stockton

46.    During mid-June 2012, MILLS called CS2 using (209) 570-7459. MILLS inquired why he had not heard from CS2 since April 2012. MILLS informed CS2 that he and his partner had a "crew" working for them. According to MILLS, they had South Stockton "sewed up," that is, under their control. MILLS said if CS2 was serious about being consistent in the drug trade, they would show CS2 how to make serious money by working for them. MILLS said kilograms of cocaine were now over $30,000 each and would soon go up to $40,000 before long. MILLS explained this was caused by the fact that Mexican suppliers were enforcing an artificial "drought" in the supply of cocaine in order to drive up the price. MILLS went on to say that, despite these prices, he and his partner could provide pure cocaine for prices lower than anyone else if CS2 became a consistent customer. MILLS stated that he and his partner were making $300,000 a month for themselves.

47.    On June 23, 2012, CS2 telephonically contacted MILLS at (209) 570-7459. CS2 told MILLS that he/she would be willing to purchase up to ten ounces of cocaine base from MILLS in order to check the quality. MILLS explained that their cocaine base was currently selling for $1,300 an ounce but MILLS would be willing charge $1,200 an ounce. MILLS said he would be willing go as low as $1,100 or even below $1,000 if CS2 "got on the team."

48.    On June 25, 2012, CS2 telephonically contacted MILLS at (209) 570-7459. CS2 said he/she would be willing to set aside $10,000 to purchase cocaine base from MILLS the following day.

49.    On June 26, 2012, at approximately 3:00 p.m., CS2 telephonically contacted MILLS at (209) 570-7459 to confirm a time and place to meet later that day. MILLS said he was working until 6:30 p.m., but then had to meet his partner and pick up the cocaine base prior to meeting with CS2. MILLS said he wouldn't be available until 7:30 p.m. At approximately 3:30 p.m., CS2 received a call from MILLS. MILLS said he would be able to get off work earlier than expected and would be able to meet CS2 around 7:00 p.m. at the Valero gas station located at 3300 N. West Lane in Stockton.

50.    At approximately 7:00 p.m., CS2 telephonically contacted MILLS at (209) 570-7459 and informed him that he/she had arrived at the meet location. MILLS said he had just obtained the cocaine base at that moment and would arrive at the meet location in approximately 15 minutes.

51.    At approximately 6:42 p.m., surveillance units at SHERMAN's residence (2695 Ramsey Road) observed a light green BMW with paper plates turn onto Ramsey Avenue and park in front of SHERMAN's residence. At approximately 6:55 p.m., surveillance units observed the same light green BMW pulling away from the residence driven by a male black adult with a bald head. Surveillance followed the BMW directly to the Valero gas station and watched it pull alongside CS2's parked vehicle and stop. Established surveillance units located at the Valero positively identified the driver of the BMW as MILLS as he pulled into the parking lot.

52.    After arriving in the Valero lot, MILLS exited his vehicle and contacted CS2. MILLS and CS2 engaged in a brief conversation about MILLS's new BMW. MILLS then directed CS2 to a black plastic bag on the floorboard of the BMW. The bag contained 279.1 grams of suspected cocaine base. CS2 then paid MILLS $10,000 in prerecorded government money in exchange for the cocaine.

53.    Immediately after the exchange, MILLS drove directly to his residence located at 1764 Shady Forest Way in Stockton, parked in the driveway and walked directly into the house through the open garage door arriving at 7:18 p.m.

54.    At approximately 7:48 p.m., agents observed MILLS leaving the residence driving the light green BMW. Surveillance units followed MILLS to the corner of Flora Street and Sutter Street in Stockton where he met with an unidentified male black adult for approximately 15 minutes. MILLS was then followed by surveillance units to SHERMAN's residence located at 2695 Ramsey Avenue in Stockton. MILLS pulled up to the closed driveway gate, waited

for a few moments while the gate opened and then pulled onto the property and parked in front of the residence. Within moments, agents observed MILLS meeting with a male black adult who had exited the residence.

55.    The DEA Western Regional Laboratory subsequently analyzed the substance purchased from MILLS on June 26, 2012, and determined it contained 222.7 grams of cocaine base.

### Recent Information from CS1 about MILLS and SHERMAN's Drug Trafficking

56.    During the month of April, 2013, Special Agent Brian Nehring spoke with CS1. CS1 stated that he/she had recently met with MILLS in Stockton. MILLS told CS1 that his "og partner's" (referring to SHERMAN) main source of supply was no longer available to him and he had begun using a new source of supply. MILLS further explained that MILLS was also using this same source of supply, a Mexican national male adult whom he did not name, but that he (MILLS) and SHERMAN were still working together. CS1 relayed the fact that MILLS had been asking where CS2 was and was asking CS1 why CS2 had not called MILLS in months. CS1 explained to MILLS that MILLS had been using a source of supply closer to where he/she was living and that CS2 had been obtaining heroin and cocaine base at a cheaper price. CS1 then indicated to MILLS that CS2 had cut ties with that source of supply and that he/she was again looking for a new source. CS1 relayed to MILLS that CS2 was interested in connecting with MILLS again for the purpose of purchasing large amounts of cocaine base. MILLS told CS1 that he could provide any amount of cocaine that CS2 needed and that CS2 should call him (MILLS) so they could set it up.

### June 27, 2013 - Purchase of Eight Ounces of Cocaine Base from Lindsey MILLS in Stockton

57.    Beginning on June 24, 2013, CS2 engaged in a series of drug-related calls with MILLS. During the course of the phone calls, CS2 arranged to purchase eight ounces of cocaine base for $8,000 on June 27, 2013. MILLS agreed to meet with CS2 at approximately 6:30 p.m. after he (MILLS) finished working for the day.

58.    On June 27, 2013, at approximately 4:30 p.m., agents established surveillance in the area of MILLS's residence located at 1764 Shady Forest Way in Stockton. At that time, no vehicles were seen in the driveway. However, at approximately 5:12 p.m., surveillance units observed a green Jeep Laredo arrive at the location and park in the garage. FBI Special Agent Toy observed a white female adult exit the driver door and walk around the rear of the vehicle before the garage door closed. The Laredo displayed license plate number 5WUV256. According to DMV records, this license plate number is registered to Karen L. MILLS and Lindsey E. MILLS 1764 Shady Forest Way in Stockton.

59.   At approximately 4:50pm, Special Agent Nehring instructed CS2 to place a telephone call to MILLS (recorded and monitored by Special Agent Nehring) at (209) 570-7459. MILLS stated that he would be getting off work at 6:30pm and would meet CS3 soon thereafter, at the same location they had met the last time MILLS sold cocaine base to the CS2 (3300 N. West Lane Stockton, California).

60.   At approximately 6:38 p.m., surveillance units observed a green BMW 7-series, with paper plates that read "VALLEYBMW.NET," driving into the neighborhood of 1764 Shady Forrest Way. Surveillance units observed the vehicle park in the driveway of 1764 Shady Forrest Way. SA Toy positively identified the driver of the green BMW as Lindsey MILLS based on a California DL photograph (#N4669067). MILLS was observed wearing a maroon short sleeve shirt with a patch on the left sleeve with the letters "RTD". After exiting the vehicle, MILLS was seen carrying a cylindrical shaped container as he walked to the trunk of the vehicle. MILLS removed a white plastic bag containing an unknown substance from the trunk. MILLS then moved the green garbage can from the street to the side of his residence before entering through the open garage door.

61.   At approximately 6:00 p.m., Special Agent Nehring and TFO Malmquist searched CS2's person and vehicle for contraband, money, and weapons. None were found. Special Agent Nehring provided CS2 with $8,000 of prerecorded government money to make the purchase of the approximately eight ounces of cocaine base from MILLS. CS2 was outfitted with a concealed transmitter and recorder which allowed the ensuing meeting and purchase to be recorded.

62.   At approximately 6:46 p.m., surveillance units observed MILLS exit the garage of 1764 Shady Forest Way wearing the same clothing and carrying the same white plastic bag. Special Agent Toy noticed that the contents of the bag appeared to be smaller than when MILLS removed the bag from the trunk. MILLS got into the green BMW, backed out of the driveway, and drove away from the residence as the garage door was closing.

63.   At approximately 6:20 p.m., Special Agent Nehring, TFO Malmquist and METRO Detectives Verber and Eastin followed CS2 from the pre-stage location to the Valero parking lot located at 3300 N. West Lane in Stockton, arriving at approximately 6:25 p.m. At approximately 6:48 p.m., surveillance units observed a light green BMW with paper plates pull into the Valero gas station parking lot and park next to CS2's vehicle. A black male adult wearing a maroon short sleeve shirt exited the driver's seat. Metro Detective Verber positively identified the driver of the green BMW as Lindsey MILLS.

64.   After arriving in the Valero parking lot, MILLS exited his vehicle and contacted CS2. CS2 and MILLS engaged in a brief conversation before CS2 reached into MILLS vehicle and removed a white plastic bag containing approximately eight ounces (279.3gg) of suspected

cocaine base. At the same time, CS2 placed $8,000 as payment for the eight ounces of cocaine base in the vehicle. CS2 and MILLS then spoke for a few more minutes before MILLS was observed getting back into his vehicle and exiting the parking lot followed by surveillance units. CS2 remained in the parking lot for approximately two minutes before exiting and driving directly to a pre-determined location followed by SA Nehring and TFO Malmquist.

65.    After arriving at the pre-determined location, CS2 immediately turned over the approximate eight ounces (279.3gg) of cocaine base that CS2 had purchased from MILLS. CS2 and CS2's vehicle were again searched for weapons, money and contraband. None were found.

66.    Surveillance followed MILLS directly from the Valero to a Stockton neighborhood directly south of Highway 4 and west of Highway 99 before losing sight of his vehicle. Special Agent Brian Nehring was monitoring court-authorized global positioning data (GPS data) for SHERMAN's cellular telephone, (209) 993-9753, and noted that the GPS data showed SHERMAN's cell phone in the same area that surveillance lost sight of MILLS. Based on the previous controlled purchases from MILLS by CS2, I believe MILLS was planning to meet with SHERMAN in that area of Stockton to pay SHERMAN, MILLS's source of supply, for the cocaine base that he had just sold to CS2. This hypothesis is supported by an analysis of MILLS and SHERMAN'S cellular history.

67.    On June 26, 2013, after speaking with CS2 when CS2 confirmed the order for eight ounces of cocaine base from MILLS the following day, cellular telephone record analysis showed that MILLS immediately called SHERMAN. After speaking with SHERMAN, MILLS called CS2 and stated that he could do the deal for the agreed upon price of $1,000 per ounce.

68.    Immediately after the sale of eight ounces of cocaine base to CS2, an analysis of SHERMAN'S cellular telephone showed that SHERMAN's cellular telephone received a call from MILLS at 7:13 p.m., just minutes after the transaction and as agents were following MILLS away. SHERMAN then called MILLS at 7:20 p.m. This coincides with the approximate time surveillance units following MILLS lost sight of MILLS driving in the same area of Stockton that the global positioning of SHERMAN's phone indicated SHERMAN was at that same time.

**July 2013 narcotics-related calls with MILLS regarding up-coming transaction scheduled for July 11th, 2013**

69.    CS2 was telephonically contacted by MILLS on July 7th, 2013 at which time MILLS solicited CS2 to conduct a much larger cocaine base transaction. CS2 told MILLS that he/she would consider utilizing MILLS as the source of supply for at least a kilogram or

more of cocaine base for a deal he/she was attempting to conduct the following week. MILLS informed CS2 that his source, whom he referred to as his long-time partner and as the same age as MILLS, would be prepared to supply MILLS with any amount of cocaine base that CS2 might want. CS2 related that he/she spoke again with MILLS on July 8th, 2013 at which time MILLS indicated he would speak with his source to confirm the prices. MILLS called CS2 back and told CS2 that per his source a kilogram of cocaine base would be $31,500.00. MILLS also informed CS2 that his source had plenty of heroin available as well.

70.     On July 9th, 2013, CS2 telephonically contacted MILLS in SA Nehring's presence and during a recorded telephone call told MILLS that he/she would want at a kilogram and a half of cocaine base on July 11th, 2013. MILLS agreed to a price of $46,000.00 for this amount of cocaine base. CS2 told MILLS that he/she would probably want at least ten ounces of heroin as well on that date but would let MILLS know. MILLS indicated that his source was taking care of having the cocaine base ready that day and that the heroin was always available at any amount the CS ordered. MILLS and CS2 agreed to meet on July 11th, 2013 at approximately 9:30 am before MILLS went to work.

### Training and Experience Regarding Drug Trafficking and Drug Traffickers

71.     As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live. United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986). It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).

72.     Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over

them. Typically traffickers keep records of those registrations and transactions in their residence.

73.    I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

74.    In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

75.    In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, heroin and cocaine base and which they intend to distribute. It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

76.    In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

77.    In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

78.    In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my

experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution.   During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other then themselves in an effort to avoid detection by law enforcement.

79.   In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

80.   In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

81.   Individuals involved in the distribution of heroin, cocaine and cocaine base often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their methamphetamine distribution, use, possession, or any other activities surrounding their cocaine and methamphetamine trafficking activities, and that such items often identify co-conspirators in their methamphetamine trafficking activities.

82.   It has been my experience in the past, and particularly in this case, that when suspects utilize mobile telephones to communicate with cooperating individuals or undercover agents to set up the heroin and cocaine base deals, records relating to these activities will be found stored in the cellular telephone.

83.   I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave

messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

84.    As described above and in Attachment A, this Affidavit seeks permission to search and seize things that are related to the ongoing heroin and cocaine base conspiracy between MILLS and SHERMAN, in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

85.    It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including heroin and cocaine base, as well as the proceeds from such illegal operations.

86.    The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

87.    Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in Attachment B. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in Attachment B to this Affidavit and incorporated here by reference.

**Conclusion**

88.　In this case, there is probable cause to believe the locations listed in Attachment A to this Affidavit contains evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically, Lindsey Earl MILLS and James Randolph SHERMAN and their ongoing collective agreement to distribute and possess with intent to distribute heroin and cocaine base in violation of 21 U.S.C. §§ 846 and 841(a)(1).

89.　Specifically, I respectfully request authority to search:

　　A.　The current residence of MILLS located at **1764 Shady Forest Way, Stockton, California,** further described as a single family, single story residence, tan in color with white and blue trim, with a blue front door, with the numerals 1764 in black on a white background affixed to the front of the structure;

　　B.　**San Joaquin County parcel APN#089-100-48** in San Joaquin County, California, corresponding to a listed address of **2695 Ramsey Avenue, Stockton, California** per San Joaquin County Property Records, further described as a 12.5 acre rural parcel located at the north west termination of Ramsey Avenue, with two structures contained on the parcel, both grey stucco in color with tan roofs and sharing a semi-circular driveway, accessed by a wrought-iron frontage gate, with black mail boxes in front displaying the numbers 2695 and 2701;

　　C.　The person of Lindsey Earl MILLS;

　　D.　The person of James Randolph SHERMAN; and

　　E.　All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.

90.    I further request that based upon this Affidavit, a Criminal Complaint and arrest warrants be
       issued for Lindsey Earl MILLS and James Randolph SHERMAN charging them with:

       COUNT ONE: BOTH DEFENDANTS: Between approximately March 14, 2012 and the
       present, conspiracy to distribute and possess with intent to distribute at least 100 grams of a
       mixture and substance containing a detectable amount of heroin, a Schedule I Controlled
       Substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

       COUNT TWO: BOTH DEFENDANTS: Between approximately June 26, 2012 and the
       present, conspiracy to distribute and possess with intent to distribute at least 280 grams
       mixture and substance containing a detectable amount of cocaine base, a Schedule I
       Controlled Substance, in violation of 21 U.S.C §§ 846 and 841(a)(1).

I swear under penalty of perjury, that the foregoing information is true and correct to the best of
my knowledge, information and belief.

Gary Malmquist, Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before
me on the ___10___ day of July, 2013

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

Jason Hitt
Assistant U.S. Attorney